UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MIDLAND DISTRIBUTION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | 21 C 1403 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| ZEST US WHOLESALE, INC., ADIL AL HOURANI, and SHAM TRADING, LLC, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Midland Distribution, Inc. brings this diversity suit against Zest US Wholesale, Inc., its agent Adil Al Hourani, and SHAM Trading, LLC, alleging that they intentionally interfered with its prospective economic advantage and violated the Uniform Deceptive Trade Practices Act ("UDTPA"), 815 ILCS 510/1 *et seq.*, by encroaching on its exclusive distribution territory for a certain brand of snack chips. Doc. 1. Midland moved for a preliminary injunction and for limited discovery, Docs. 15, 22, but the court denied those motions after Midland acknowledged that it was no longer pursuing that relief, Doc. 51. Zest and Al Hourani (together, "Zest") move under Civil Rule 12(b)(6) to dismiss the claims against them. Doc. 26. The motion is granted.

**Background**

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court also must consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Midland's opposition brief, so long as those additional facts "are consistent with the

1

pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (citation omitted). The facts are set forth as favorably to Midland as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

Midland is a distributor of food products. Doc. 1 at ¶ 8. It alleges that around August 2019, it obtained exclusive territorial distribution rights for Mr. Chips, a brand of snack chips manufactured by Haddad & Sons Co., a Jordanian company. *Id*. at ¶¶ 9, 11, 13. Midland further alleges its exclusive distribution agreement with Haddad consists of "a series of written communications" detailing its exclusive territory. *Id*. at ¶ 10; *see also* Doc. 42 at 5 (Midland asserting that the written agreement was finalized on January 6, 2020). Midland attached those written communications as exhibits to its preliminary injunction motion. Docs. 15-2, 15-3, 15-9, 45. Although that motion was denied, those writings are properly considered in evaluating Zest's motion to dismiss because Midland refers to them in the complaint and incorporates them in its brief opposing dismissal. Doc. 42 at 2, 4-10, 14; *see Phillips*, 714 F.3d at 1020.

A. **Communications Between Midland and Haddad**

In June 2019, Midland's agent met with Haddad export manager Raed Assaf to discuss a potential business relationship between the two companies. Doc. 45 at p. 3, ¶¶ 14-15. The next month, Assaf exchanged emails with Midland president Daniel Sweis about prices and the shipment of Mr. Chips products to the United States from Jordan. *Id*. at pp. 17-18.

On August 19, 2019, Sweis emailed Assaf a draft exclusive distribution agreement designating the entire United States, except California, as Midland's exclusive distribution territory. *Id*. at pp. 21-24. The draft, which included a provision stating that the agreement was governed by Illinois law, did not set forth a sales quota or definite duration. *Id*. at pp. 22-24. In

2

an August 26 email, Sweis told Assaf that he had spoken with another Haddad agent about what was "hold[ing] business up" and that he hoped that "this process [could] move forward at a faster pace." *Id*. at p. 29.

In a text message on September 20, 2019, Assaf told Sweis that he had "approval on the contract" and that it would just be "a matter of time," promising to return "the first draft [of] the contract" the following week. *Id.* at pp. 26-27. Negotiations continued, and on October 29, Sweis sent Assaf a revised draft with a smaller exclusive sales territory. *Id.* at p. 33-36. In a November 27 email to Assaf, Sweis summarized their further discussions, including a purported agreement on sales quotas for 2020 and 2021. *Id*. at p. 38. Sweis stated in the email that he hoped to "finalize our agreement as soon as possible" so that Midland could "move forward with the next set of purchase orders." *Ibid*.

On December 23, 2019, after another conversation, Sweis e-mailed Assaf to say that he was comfortable submitting two purchase orders, adding: "Once I receive the draft agreement (hopefully tomorrow) I will put together the next 3 [purchase orders] and on[c]e we finalize the agreement I will submit the next 5." *Id*. at p. 40-41. Sweis closed by expressing frustration with the pace of the negotiations: "We lost a lot of time and now we need to make up for it. Please do what you can to move things along." *Id*. at p. 41.

On January 5, 2020, Assaf replied with what he called a "draft" agreement, which was unsigned and dated November 6, 2019. *Id*. at pp. 40-46. Midland submits that this draft "incorporated Haddad's proposed final modifications and comments to the distribution contract." *Id*. at p. 4, ¶ 24. The draft removed Texas, Oklahoma, Florida, and New Jersey from the territory set forth in Midland's October 29 draft, *id*. at p. 42; set a sales quota of 24,000 cases per year, *id*.

3

at p. 43; and included a durational term of three years, *id*. at p. 44. The draft stated that it was to be governed by and construed in accordance with the laws of Jordan. *Id*. at pp. 45-46.

The next day, January 6, 2020, Sweis emailed Assaf a further revised draft, which added back Texas, Oklahoma, and Florida to the exclusive sales territory, and added Arizona as well. *Id*. at pp. 48-53. Sweis's email stated that the addition of those States reflected a conversation he and Assaf had that morning. *Id*. at p. 48. The quota, durational term, and choice-of-law provisions remained the same as those in Assaf's January 5 draft. *Id*. at pp. 50-51, 53. Sweis asked Assaf "to execute and return as soon as possible." *Id*. at p. 48. At the motion hearing, Doc. 51, Midland conceded that Haddad never returned a signed copy.

On May 4, 2020, Sweis texted Assaf to complain about rival distributors selling in what he asserted was Midland's exclusive territory. Doc. 45 at p. 116. Assaf apologized, stating, "This is not acceptable at all." *Ibid*. That day, Sweis emailed Assaf to confirm Midland's territory, listing many of the States listed in the January 6 draft he sent to Assaf, but excluding Delaware, Maryland, New York, Vermont, Rhode Island, Maine, Massachusetts, and Arizona. *Id*. at p. 115. The next day, May 5, Assaf replied:

> This is to confirm that territories you mentioned below will be designated just for Midland distribution
> Please consider this mail as commitment from our side to your esteemed company
> Of course more detailed contract will be signed between us to regulate other issues like monthly sales targets, sales forecast etc…

*Id*. at p. 114.

On October 24, 2020, Sweis sent another text to Assaf complaining about a rival distributor's distribution of Mr. Chips products in Michigan. *Id*. at p. 120. Assaf replied that "[n]ext week you will receive the contract" and that the competitor "will not get goods anymore." *Ibid*.

4

### B. Zest's Distribution of Mr. Chips Products

Zest is a distributor of Mr. Chips products. Doc. 1 at ¶¶ 19, 20. Around August 2019, Zest sold Mr. Chips product to Prime Foods, a distributor in Florida, *id*. at ¶ 24, one of the States listed in some of the drafts of the Midland-Haddad agreement, Doc. 45 at pp. 34, 49, and in the early May 2020 emails between Sweis and Assaf, *id*. at pp. 114-115. Sweis notified Assaf in February 2020 of Zest's alleged encroachment on Midland's asserted territory, and Assaf assured Sweis that he would raise the issue with Zest. Doc. 1 at ¶ 25. Haddad then told Zest that Florida was Midland's territory and directed it to stop selling chips there. *Id*. at ¶ 26.

In May 2020, Midland notified Haddad that it had discovered more Mr. Chips products sold by Zest in Florida. *Id*. at ¶¶ 27-28. Sweis called Prime Foods to inform it directly that Midland was the exclusive distributor of Mr. Chips products in Florida. Doc. 45 at pp. 9-10, ¶ 55. Yet in July and August 2020, Zest continued to sell in Midland's territory. Doc. 1 at ¶ 32; Doc. 45 at p. 10, ¶ 56. On August 14 and 25, 2020, Midland had phone calls with Prime Foods and Zest, during which Al Hourani (Zest's agent) conceded that Florida was in Midland's exclusive territory. Doc. 1 at ¶¶ 29-30; Doc. 45 at p. 10, ¶ 58.

In December 2020, Midland discovered that Zest had sold Mr. Chips products in Illinois, Michigan, and Texas, Doc. 1 at ¶ 34, which were listed as part of Midland's territory in some drafts of the Midland-Haddad agreement, Doc. 45 at pp. 34, 49, and in Sweis's early May 2020 email correspondence with Assaf, *id*. at pp. 114-115. Wholesalers within Midland's territory, including Midland's customers, confirmed purchasing Mr. Chips products through Zest. Doc. 1 at ¶ 35. Zest had told these wholesalers that it could sell Mr. Chips products anywhere. *Ibid*.; Doc. 45 at p. 12, ¶ 65.

On December 10, 2020, Midland sent Zest a cease-and-desist letter. Doc. 1 at ¶ 36. On January 12, 2021, Zest responded that it "[did] not want to interfere with [Midland's] territory."

Doc. 15-7 at 3. Zest asserted that "[a]nything that may have been sold into those territories was sold prior to any notice by [Haddad], or the signing of a formal agreement between [Zest] and [Haddad], or [Midland] and [Haddad] for that matter." *Ibid*. Zest added that "[i]f there is anyone else, please let us know so that we can assist [Midland] in maintaining the integrity of [its] territory." *Ibid*. On January 22, Zest repeated that it "does not sell any Mr. Chips products in [Midland's] territory." *Id*. at 2.

On January 24 and February 14, 2021, Midland discovered more Mr. Chips products that had been distributed by Zest in Illinois. Doc. 45 at pp. 12-13, ¶¶ 68, 72. Zest continues to disregard what Midland claims to be its exclusive distribution territory and engages in what Midland terms "price dilution," that is, selling Mr. Chips products "at a lower price." *Id*. at p. 13, ¶¶ 73, 77.

## Discussion

### I. Intentional Interference with Prospective Economic Advantage Claim

"The elements of [an intentional interference with prospective economic advantage] claim are: (1) the plaintiff's reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful or intentional interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from the interference." *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 398 (7th Cir. 2003); *accord Anderson v. Vanden Dorpel*, 667 N.E.2d 1296, 1299 (Ill. 1996). Midland alleges that Zest interfered with its expected business relationships with retailers of Mr. Chips products in its exclusive distribution territories. Doc. 42 at 11. In its papers and at the motion hearing, Doc. 51, Midland acknowledged that its theory of business expectancy—and thus its intentional interference claim—is premised on the existence of an exclusive distribution agreement between

it and Haddad. Doc. 42 at 2 (Midland acknowledging that this claim "hinge[s] on the factual existence of the exclusive distribution contract rights alleged in the complaint"). Zest moves to dismiss Midland's claim on the ground that no such agreement had been formed. Doc. 27 at 9.

Both parties assume that Illinois law governs the question whether Midland and Haddad formed an exclusive distribution agreement. Doc. 27 at 7; Doc. 42 at 7. Accordingly, and because this suit was filed in a district court in Illinois and neither party argues choice of law, the court will apply Illinois law on contract formation. *See Jackson v. Bank of Am. Corp.*, 711 F.3d 788, 791 (7th Cir. 2013); *Ryerson Inc. v. Fed. Ins. Co.*, 676 F.3d 610, 611 (7th Cir. 2012).

Under Illinois law, "an agreement is not enforceable as a contract, because of its uncertainty, when any of its essential terms are left unsettled." *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 850 (7th Cir. 2007) (citation omitted). The essential terms of an exclusive distribution agreement include a "durational term[]" and a "sales quota." *Ryan v. Wersi Elecs. GmbH & Co.*, 3 F.3d 174, 181 (7th Cir. 1993); *see* Doc. 42 at 7 (Midland tacitly acknowledging the point) (citing *Ryan*, 3 F.3d at 181). A territory or "area" term is another essential term of an exclusive distribution agreement. *Kraftco Corp. v. Kolbus*, 274 N.E.2d 153, 155 (Ill. App. 1971) (holding that a purported exclusive distribution contract lacking terms for "duration, prices, area, products, quotas, etc." was too indefinite to be enforceable).

No plausible inference can be drawn from the present record—that is, from the materials properly considered on a Rule 12(b)(6) motion—that Midland and Haddad formed an exclusive distribution agreement with all essential terms. Although the January 6, 2020 draft agreement sent by Sweis appeared to accept Haddad's proposed sales quota and duration terms, Sweis's draft differed materially from Assaf's draft as to the territory term. *Compare* Doc. 45 at p. 42 (Assaf's January 5 version, listing twenty-six States), *with id.* at pp. 48, 49 (Sweis's January 6

7

version, adding Texas, Oklahoma, Florida, and Arizona). Thus, as of January 6, there was no "meeting of the minds" as to *all* essential terms, and record does not support an inference that Haddad later accepted the territory term proposed by Midland on January 6. A further cloud on the territory term is cast by Sweis's May 4, 2020 email, which described a territory that excluded eight States that had been included in his January 6 draft. *Id*. at 115. Thus, although the parties exchanged drafts of the agreement, they did not reach the requisite "meeting of the minds" on the territory term. *Quinlan v. Stouffe*, 823 N.E.2d 597, 604 (Ill. App. 2005) ("[T]he two existing draft 'settlement agreements' differ in essential terms. Since a meeting of the minds between the parties occurs when there has been assent to the same things in the same sense on all essential terms and conditions, the parties here did not have a meeting of the minds … .").

True enough, Assaf's May 5, 2020 email appeared to agree to the territory described in Sweis's May 4 email. *Id*. at 114. But at the motion hearing, Doc. 51, Midland disavowed any use of any post-January 2020 communications to show mutual assent to a contract. And even putting aside that disavowal, Assaf's apparent agreement on May 5 to the territory Sweis described was explicitly tied to Assaf's statement that a "more detailed contract will be signed … to regulate other issues like monthly sales targets, sales forecast etc." Doc. 45 at p. 114. Thus, although the parties' early May 2020 correspondence may have indicated agreement on the territory term, Assaf's email shows that there was no agreement at that point on the sales quota term.

At most, then, the parties reached preliminary agreements as to sales quota and duration terms (but not the area term) in January 2020, and the area term (but not the sales quota term) in May 2020. The court cannot string together those communications to create a contract. *See Haslund v. Simon Prop. Grp., Inc.*, 378 F.3d 653, 655 (7th Cir. 2004) ("[T]he omission of crucial

terms is powerful evidence that no contract was intended."). The materials placed in the record by Midland thus defeat any inference of such intent, meaning the parties never reached an enforceable agreement.

Midland's submission that the parties formed an exclusive distribution agreement is wrong for a second, independent reason: the parties' failure to formalize the agreement. The materials submitted by Midland show that it engaged in ongoing negotiations with Haddad up to and including their May 2020 correspondence. However, as Midland acknowledged at the motion hearing, Doc. 51, Haddad never returned a signed copy of the January 6, 2020 draft or any other draft. Illinois law provides that, "where the anticipated document is never executed, the parties' conduct and statements subsequent to the oral agreement may be decisive of the question whether a contract had been made." *Ceres Ill., Inc. v. Ill. Scrap Processing, Inc.*, 500 N.E.2d 1, 5 (Ill. 1986). Put another way, under these circumstances, the court must "focus on the parties' intentions to determine whether an enforceable contract [came] into being during the course of negotiations, or whether some type of formalization of the agreement [was] required before it becomes binding." *Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr.*, 692 F.3d 580, 588 (7th Cir. 2012) (citation omitted); *see also Magallanes Inv., Inc. v. Cir. Sys., Inc.*, 994 F.2d 1214, 1218 (7th Cir. 1993) (applying the same intent test for contract formation under the Uniform Commercial Code, 810 ILCS 5/2-204). To determine the parties' intent, the court "look[s] to all of the circumstances surrounding the negotiations, including the actions of the principals both during and after." *A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chem. Grp., Inc.*, 873 F.2d 155, 157 (7th Cir. 1989).

On the present record, the communications between Midland and Haddad convey a clear expectation that they would formally execute the agreement. When Midland sent a signed draft

9

to Haddad on January 6, 2020—one that altered the territory term from the Haddad's January 5 draft—Sweis asked Assaf to "execute and return [it] as soon as possible." Doc. 45 at p. 48. Even if Sweis altered the territory term based on an earlier conversation with Assaf, *ibid.*, his request that Assaf sign and return the agreement unambiguously communicated that Midland expected the agreement to be formalized before it became binding. It follows that Sweis's January 6 draft was not a binding agreement under Illinois law. *See PFT Roberson, Inc. v. Volvo Trucks N. Am., Inc.*, 420 F.3d 728, 731 (7th Cir. 2005) ("Illinois is averse to enforcing tentative agreements that are expressly contingent on the signing of formal or final documents.") (citations omitted); *Ceres*, 500 N.E.2d at 5 ("[E]ven where the essential terms have been agreed upon, if the clear intent of the parties is that neither will be legally bound until the execution and delivery of a formal agreement, then no contract comes into existence until such execution and delivery.") (internal quotation marks omitted); *Chi. Inv. Corp. v. Dolins*, 481 N.E.2d 712, 715 (Ill. 1985) ("[P]arties may specifically provide that negotiations are not binding until a formal agreement is in fact executed. If the parties construe the execution of a formal agreement as a condition precedent, then no contract arises unless and until that formal agreement is executed.").

      Haddad's subsequent communications with Midland confirm that understanding. As noted, Assaf told Sweis in early May 2020 that the States for which Midland sought exclusive distribution rights "*will be* designated just for Midland distribution," and that "[o]f course [a] more detailed contract *will be* signed between us to regulate other issues like monthly sales targets, sales forecast etc." *Id*. at p. 114 (emphasis added). Assaf's use of the future tense—"will be designated" and "will be signed"—unambiguously conveyed Haddad's expectation that any agreement with Midland required formalization. The same holds for Assaf's October 24, 2020 text messages, one of which stated that Midland "*will* receive the contract" the following

week, to which Sweis responded, "[s]ounds good." *Id*. at p. 120 (emphasis added). Again, Assaf's use of the future tense regarding Midland's receipt of the agreement cannot be reconciled with Midland's submission here that no further formalities were required after it returned the signed version of the agreement to Haddad back in January—particularly given Sweis's assent to Assaf's October timeline. *See PFT Roberson*, 420 F.3d at 731 ("When negotiators say that agreement is subject to a more definitive document, Illinois treats this as demonstrating intent not to be bound until that document has been prepared and signed."); *Ceres Ill.*, 500 N.E.2d at 5; *see also Phillips*, 714 F.3d at 1020 ("To the extent that an exhibit attached to or referenced by the complaint contradicts the complaint's allegations, the exhibit takes precedence.").

While some of Assaf's remarks to Sweis, read in isolation, could suggest that an enforceable agreement existed, that reading is defeated when considering those remarks in context. For example, in May 2020, Assaf told Midland that it was "not acceptable" that other distributors were selling Mr. Chips products in certain States. Doc. 45 at p. 116. The next day, Assaf gave Sweis a "commitment" from Haddad that certain States "will be designated just for Midland distribution." *Id*. at p. 114. But that "commitment" was stated in the future tense, not the present tense; moreover, the commitment was paired with Assaf's express understanding that a "more detailed contract will be signed … to regulate other issues like monthly sales targets, sales forecast etc." *Ibid*. Again, Assaf's statement conveyed the unambiguous message that Haddad did not believe a binding agreement would arise until the parties "signed" a "more detailed contract." *See PFT Roberson*, 420 F.3d at 731. In context, Assaf's "commitment" amounted to no more than an "informal assurance[] of good," which does not rise to the level of a contractual obligation. *Anderson*, 667 N.E.2d at 1300. The communications between Midland

and Haddad thus defeat any plausible inference that they ever finalized an exclusive distribution agreement.

Without a valid exclusive distribution agreement, Midland's intentional interference claim fails as a matter of law because, as noted, Midland acknowledges that such a contract is an essential premise for the theory of expectancy underlying that claim. Zest's motion to dismiss that claim accordingly is granted.

## II.     Uniform Deceptive Trade Practices Act Claim

Midland does not defend the UDTPA claim as pleaded in its complaint, which invokes 815 ILCS 510/2(a)(4)-(5), but instead "seeks leave to replead" the claim under 815 ILCS 510/2(a)(12). Doc. 42 at 14. Zest's motion to dismiss the UDTPA claim accordingly is granted.

## Conclusion

Zest and Al Hourani's motion to dismiss is granted. The dismissal of Midland's claims against Zest and Al Hourani is without prejudice, and Midland has until November 2, 2021, to file an amended complaint. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015) ("[A] plaintiff whose original complaint has been dismissed … should be given at least one opportunity to try to amend … ."). If Midland does not replead, the dismissal will convert to a dismissal with prejudice. If Midland repleads, Zest and Al Hourani will have until November 16, 2021, to file a responsive pleading.

October 12, 2021

United States District Judge